EMN:SPN/BDM
F.#2016R01865

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 1 3 2016 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

   - against -

TORNEOS Y COMPETENCIAS S.A.,

          Defendant.

– – – – – – – – – – – – – – – – – – X

I N F O R M A T I O N

Cr. No. <u>16-634 (PKC)</u>
(T. 18, U.S.C., §§ 981(a)(1)(C), 1349
and 3551 <u>et seq.</u>; T. 21, U.S.C., § 853(p);
T. 28, U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Information, unless otherwise indicated:

I.    <u>Background</u>

    A.    <u>FIFA</u>

        1.    The Fédération Internationale de Football Association ("FIFA") was the

international body governing organized soccer, commonly known outside the United States as

football. FIFA was an entity registered under Swiss law and headquartered in Zurich,

Switzerland. FIFA comprised as many as 209 member associations, each representing organized

soccer in a particular nation or territory, including the United States and four of its overseas

territories. At various times, FIFA maintained offices both in Zurich and elsewhere in the world,

including in the United States, where FIFA maintained a development office since at least 2011.

        2.    FIFA's purpose was, among other things, to develop and promote the

game of soccer globally by organizing international competitions and creating and enforcing

rules that govern FIFA's member confederations and associations. FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup, the sport's premier event.

3. FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006 and again in 2009 (generally, the "code of ethics"). The code of ethics governed the conduct of soccer "officials," expressly defined by FIFA's statues to include, among others, all board members, committee members and administrators of FIFA as well as FIFA's continental confederations and member associations. Among other things, the code of ethics provided that soccer officials were prohibited from accepting bribes or cash gifts and from otherwise abusing their positions for personal gain. The code of ethics further provided, from its inception, that soccer officials owed certain duties to FIFA and its confederations and member associations, including a duty of absolute loyalty. By 2009, the code of ethics explicitly recognized that FIFA officials stand in a fiduciary relationship to FIFA and its constituent confederations, member associations, leagues and clubs.

B.    The Continental Confederations

4. Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA: the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football, the Confédération Africaine de Football, the Asian Football Confederation, and the Oceania Football Confederation. Under FIFA's statutes, no national soccer association could become a member of

2

FIFA without first joining one of the six continental confederations. Member associations were required to pay to FIFA annual dues, known as subscriptions.

5.     In addition to providing representatives who helped to govern FIFA, the six continental confederations worked closely with FIFA and one another to organize international soccer competitions and carry out FIFA directives on a regional basis. The leaders and representatives of the confederations conducted business with one another, as well as with the leaders and associates of FIFA, throughout the year at locations around the world, including in the United States.

6.     CONCACAF was a continental soccer confederation incorporated as a non-profit corporation in Nassau, Bahamas. CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean, and three South American countries. The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF. From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business. Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based. CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. In June 2014, CONCACAF adopted a code of ethics that, among other things, prohibited bribery and corruption.

3

7.      CONMEBOL was a continental soccer confederation domiciled and headquartered in Paraguay.  CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its 10 members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams, including the Copa Libertadores.  Since 1993, the United States has participated in the Copa América as an invitee four times.  Most recently, the United States hosted and participated in the 2016 Copa América Centenario, a special edition of the Copa América organized jointly by CONMEBOL and CONCACAF to commemorate its centennial. In December 2013, CONMEBOL adopted a code of ethics that, among other things, prohibited bribery and corruption.

C.      Regional Federations and National Associations

8.      In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

9.      The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations.  The national association of the United States, the United States Soccer Federation, was based in Chicago, Illinois.  The national association of Argentina, the Asociación del Fútbol Argentino ("AFA"), was a national member association of CONMEBOL and was based in Buenos Aires, Argentina.

10.     The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies,"

4

which also took place on the club level.  Friendlies took place in venues throughout the United States, including the Eastern District of New York, as well as in other venues worldwide.

        D.      The Sports Marketing Companies

        11.      FIFA, the continental confederations, the regional federations, and the national member associations often entered into contracts with sports marketing companies to commercialize the media and marketing rights to various soccer events, including the World Cup and other tournaments, World Cup and Olympic qualifiers, friendlies, and other events, as well as other rights associated with the sport.  Often operating in coordination with affiliated consultants and intermediaries, these sports marketing companies, including multinational corporations with headquarters, offices, or affiliates located in the United States, often acquired an array of media and marketing rights, including television and radio broadcasting rights, advertising rights, sponsorship rights, licensing rights, hospitality rights, and ticketing rights. These sports marketing companies often sold these rights to, among others, television and radio broadcast networks, sponsors, and sub-licensees, including those located in the United States.

        12.      The revenue generated by the commercialization of the media and marketing rights associated with soccer constituted an essential source of revenue for FIFA, other governing bodies, and the sports marketing companies.  Over time, the United States became an increasingly important and lucrative market for the commercialization of these rights.

II.     The Defendant

        13.      At various times relevant to the Information, the defendant TORNEOS Y COMPETENCIAS S.A. ("TORNEOS") was a sports media and marketing business headquartered in Argentina with a number of subsidiaries and affiliates, including, among others,

T&T Sports Marketing Ltd., domiciled in the Cayman Islands, TyC International B.V., domiciled in the Netherlands, and Productora de Eventos S.A., domiciled in Uruguay. In addition, Alejandro Burzaco, Torneos Executive #1, Torneos Executive #2, Torneos Executive #3 (all three of whom are defined below), and others created and/or controlled shell companies off the books of TORNEOS, including FPT Sports S.A. and Arco Business and Developments Ltd., among others (collectively, the "Off-the-Books Companies"), to effect certain transactions with and on behalf of TORNEOS, including as described in paragraphs 34 through 42 below.

III.    Relevant Individuals and Entities

14.    At various times relevant to the Information, Banker #1 and Banker #2 worked as client advisors in the private banking sector at prominent banking institutions based in Switzerland. The identities of Banker #1 and Banker #2 are known to the United States Attorney.

15.    At various times relevant to the Information, Luis Bedoya was a high-ranking official of FIFA, CONMEBOL, and the Federación Colombiana de Fútbol, the Colombian soccer federation, one of FIFA's national member associations.

16.    At various times relevant to the Information, Broadcasting Company Executive #1 was a high-ranking executive of Broadcasting Company Affiliate A, an affiliate of a major broadcasting company headquartered in Latin America, which obtained from FIFA rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories in Latin America. The identities of Broadcasting Company Executive #1 and Broadcasting Company Affiliate A are known to the United States Attorney.

6

17.     At various times relevant to the Information, Broadcasting Company Executive #2 and Broadcasting Company Executive #3 were high-ranking executives of Broadcasting Company Affiliate B, an affiliate of a major broadcasting company headquartered in the United States, which was, through another affiliate, part of a group of investors in an affiliate of the defendant TORNEOS Y COMPETENCIAS S.A. that owned the exclusive worldwide broadcasting rights to the CONMEBOL Copa Libertadores.  The identities of Broadcasting Company Executive #2, Broadcasting Company Executive #3, and Broadcasting Company Affiliate B are known to the United States Attorney.

18.     At various times relevant to the Information, Broadcasting Company Executive #4 was a high-ranking executive of Broadcasting Company Affiliate C, which was among the investors in an affiliate of the defendant TORNEOS Y COMPETENCIAS S.A. that owned the exclusive worldwide broadcasting rights to the CONMEBOL Copa Libertadores.  Broadcasting Company Affiliate C was owned, at times in part and at times wholly, by Broadcasting Company Affiliate B.  The identities of Broadcasting Company Executive #4 and Broadcasting Company Affiliate C are known to the United States Attorney.

19.     At various times relevant to the Information, Alejandro Burzaco was the General Manager, President of the Board of Directors, and legal representative of the defendant TORNEOS Y COMPETENCIAS S.A. and a principal of TORNEOS's subsidiaries and affiliates, as well as the Off-the-Books Companies.

20.     At various times relevant to the Information, Datisa S.A. ("Datisa") was a Uruguayan company formed in 2013 by Productora de Eventos S.A., a subsidiary of the defendant TORNEOS Y COMPETENCIAS S.A., Traffic (defined below), and Sports Marketing

7

Company A (defined below) that held the exclusive worldwide commercial rights to the 2015, 2019 and 2023 editions of the Copa América and the 2016 Copa América Centenario.

21.     At various times relevant to the Information, Rafael Esquivel was a high-ranking official of CONMEBOL and the Federación Venezolana de Fútbol, the Venezuelan soccer federation, one of FIFA's national member associations.

22.     At various times relevant to the Information, José Hawilla was the founder and owner of the Traffic Group, a multinational sports marketing company based in São Paulo, Brazil. The Traffic Group comprised, among other entities, Traffic Assessoria e Comunicações S/C Ltda., Traffic Sports International, Inc., Traffic Sports USA, Inc., Traffic Sports Europe B.V., and Continental Sports International, Inc. (referred to collectively herein as "Traffic" or the "Traffic Group").

23.     At various times relevant to the Information, Sergio Jadue was a high-ranking official of CONMEBOL and the Asociación Nacional de Fútbol Profesional de Chile, the Chilean soccer federation, one of FIFA's national member associations, and a member of FIFA's associations committee.

24.     At various times relevant to the Information, José Margulies was a controlling principal of Valente Corp. ("Valente") and Somerton Ltd ("Somerton") (together, the "Margulies Intermediaries"), South American companies registered in Panama and Turks and Caicos, respectively, that were involved in the broadcasting of soccer matches. At various times, Margulies used accounts in the names of Valente and Somerton that were held at United States financial institutions to make illicit payments on behalf of multiple members of the conspiracy,

8

including the defendant TORNEOS Y COMPETENCIAS S.A. and certain of its subsidiaries and affiliates and the Off-the-Books Companies.

25.     At various times relevant to the Information, the following individuals, whose identities are known to the United States Attorney, were high-ranking soccer officials of FIFA and/or one or more of FIFA's constituent bodies:

- Soccer Official #1 was a high-ranking official of FIFA, CONMEBOL, and AFA.

- Soccer Official #2 was a high-ranking official of a national member association of CONMEBOL and an official of FIFA.

- Soccer Official #3 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

- Soccer Official #4 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

- Soccer Official #5 was a high-ranking official of FIFA and a national member association of CONMEBOL.

- Soccer Official #6 was a high-ranking official of CONMEBOL.

- Soccer Official #7 was a high-ranking official of FIFA, CONMEBOL, and a national member association of CONMEBOL.

- Soccer Official #8 was a high-ranking official of FIFA and CONMEBOL.

- Soccer Official #9 was an official of FIFA and a high-ranking official of a national member association of CONMEBOL.

- Soccer Official #10 was a high-ranking official of CONMEBOL and a national member association of CONMEBOL.

- Soccer Official #11 was a high-ranking official of FIFA, CONMEBOL, and a national member association of CONMEBOL.

9

- Soccer Official #12 was an official of FIFA and a high-ranking official of CONMEBOL.

- Soccer Official #13 was a high-ranking official of FIFA and a national member association of CONMEBOL.

26.    At various times relevant to the Information, Sports Marketing Executive #1 and Sports Marketing Executive #2 were the controlling principals of Sports Marketing Company A, a sports media and marketing business with its principal offices in Argentina. Sports Marketing Company A had a number of subsidiaries and affiliates, all of which are referred to collectively below as "Sports Marketing Company A." The identities of Sports Marketing Executive #1, Sports Marketing Executive #2, and Sports Marketing Company A are known to the United States Attorney.

27.    At various times relevant to the Information, the following individuals, whose identities are known to the United States Attorney, were high-ranking executives of the defendant TORNEOS Y COMPETENCIAS S.A.:

- Torneos Executive #1 was a co-founder, director, and principal of TORNEOS until in or about March 2010.

- Torneos Executive #2 worked in administration and finance for TORNEOS until in or about June 2015.

- Torneos Executive #3 worked in the legal department of TORNEOS until in or about June 2015.

28.    At various times relevant to the Information, Jeffrey Webb was the president of the Cayman Island Football Association, a member of the Caribbean Football Union ("CFU") executive committee, the chairman of CFU's normalization committee, the president of CONCACAF, and a FIFA vice president and executive committee member. Webb also served

10

on multiple FIFA standing committees, including the finance committee and the organizing
committee for the World Cup.

* * * *

29.     Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer
Official #1, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer
Official #6, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10,
Soccer Official #11, Soccer Official #12, and Soccer Official #13 were bound by fiduciary duties
to each of their respective soccer governing bodies.

IV.     The Scheme

A.     Overview

30.     Beginning in or about the 1990s and continuing until in or about May
2015, the defendant TORNEOS Y COMPETENCIAS S.A. and its co-conspirators, including the
above-referenced soccer officials, devised a scheme and artifice to deprive FIFA and its
constituent organizations of their respective rights to the honest and faithful services of certain of
their leaders through the systematic payment of bribes and kickbacks. Specifically, TORNEOS,
at the direction and through the conduct of its employees, including Alejandro Burzaco, Torneos
Executive #1, Torneos Executive #2, and Torneos Executive #3, agreed to pay and did pay bribes
and kickbacks to certain officials of FIFA, CONMEBOL, CONCACAF, and AFA in exchange
for the officials' provision of support and assistance to TORNEOS in its efforts to obtain,
maintain, and exploit lucrative media and marketing rights to various soccer tournaments and
matches.

11

31.    Over the course of the scheme, the defendant TORNEOS Y

COMPETENCIAS S.A. agreed to pay and caused to be paid, directly and indirectly, tens of

millions of dollars in bribe and kickback payments to Soccer Official #1 in exchange for, among

other things, Soccer Official #1's provision of support and assistance to TORNEOS in its efforts

to obtain, maintain, and exploit the media and marketing rights to various soccer tournaments

and matches.  TORNEOS and Soccer Official #1 developed a close relationship of mutual

support, maintained and promoted through the payment of bribes and kickbacks to Soccer

Official #1, that contributed to the common benefit of TORNEOS and its co-conspirators.

32.    In furtherance of the scheme and to effect its objects, the defendant

TORNEOS Y COMPETENCIAS S.A. agreed to pay and caused to be paid, directly and

indirectly, bribes and kickbacks to Soccer Official #1 and other soccer officials, including Luis

Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #2, Soccer Official #3,

Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7, Soccer Official #8,

Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer

Official #13.  TORNEOS agreed to pay these officials and did cause them to be paid in exchange

for their official support of TORNEOS in its efforts to obtain, maintain, and exploit media and

marketing rights to various soccer tournaments and matches, including, among other

tournaments and matches, the FIFA World Cup, CONMEBOL Copa América,

CONMEBOL/CONCACAF Copa América Centenario, CONMEBOL Copa Libertadores,

CONMEBOL Copa Sudamericana, CONMEBOL Recopa Sudamericana, and international

friendlies featuring the Argentinian men's national soccer team.

12

B.    Conduct in Furtherance of the Conspiracy

33.    By way of example, set forth below are further details regarding certain conduct undertaken by the defendant TORNEOS Y COMPETENCIAS S.A. and its co-conspirators in furtherance of the scheme and to effect its objects.

i.    FIFA World Cup Rights

34.    In or about and between 2010 and 2013, the defendant TORNEOS Y COMPETENCIAS S.A.'s wholly-owned subsidiary TyC International B.V. obtained the rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup to audiences in Argentina, Uruguay, and Paraguay through a series of contracts with the Off-the-Books Companies and Broadcasting Company Affiliate A, which had secured the rights to broadcast the tournaments in these and other territories directly from FIFA.  TORNEOS, through Alejandro Burzaco and others, and at times with the assistance of one or more representatives of Broadcasting Company Affiliate A, including Broadcasting Company Executive #1, agreed to pay and did pay millions of dollars in bribe and kickback payments to Soccer Official #1 – a high-ranking FIFA official who exercised enormous influence within the association – in order to secure his support for Broadcasting Company Affiliate A's acquisition of rights to broadcast the 2018, 2022, 2026, and 2030 editions of the World Cup in certain territories, and the subsequent purchase and exploitation of certain of those rights by TyC International B.V.

35.    Among other things, Soccer Official #1 agreed to use and did use his influence to push FIFA to sell the rights to broadcast the 2026 and 2030 editions of the World Cup in certain Latin American territories to Broadcasting Company Affiliate A in 2013, earlier

13

than anticipated and long before the selection of host countries for those editions of the tournament.

          ii.     CONMEBOL Copa Libertadores Rights

      36.     Beginning in or about 1999 and continuing through in or about May 2015, T&T Sports Marketing Ltd. ("T&T"), an affiliate of the defendant TORNEOS Y COMPETENCIAS S.A., acquired the exclusive worldwide broadcasting rights to each edition of the Copa Libertadores, an annual tournament organized by CONMEBOL featuring the confederation's top men's club teams, through a series of contracts between T&T and CONMEBOL. T&T eventually acquired the rights to two less prominent tournaments, the Copa Sudamericana and Recopa Sudamericana, also through a series of contracts between T&T and CONMEBOL. T&T was owned in part by TORNEOS and in part by partners in the venture, including, for a brief period, Traffic, and, later, a group of investors that included Broadcasting Company Affiliate B. Broadcasting Company Affiliate B invested in T&T through its ownership interest in Broadcasting Company Affiliate C.

      37.     Beginning at least as early as in or about 2000 and continuing through in or about May 2015, the defendant TORNEOS Y COMPETENCIAS S.A., through Torneos Executive #1 and, later, Alejandro Burzaco and others, and at times with the agreement and support of representatives of Broadcasting Company Affiliate B and Broadcasting Company Affiliate C, including Broadcasting Company Executive #2, Broadcasting Company Executive #3, and Broadcasting Company Executive #4, agreed to pay and caused to be paid annual six-figure and, in some instances, seven-figure bribe and kickback payments to, variously, Luis Bedoya, Rafael Esquivel, Sergio Jadue, Soccer Official #1, Soccer Official #2, Soccer Official

14

#3, Soccer Official #4, Soccer Official #5, Soccer Official #6, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13 in exchange for the officials' support of T&T as the holder of the broadcasting rights to the Copa Libertadores.

38.     The defendant TORNEOS Y COMPETENCIAS S.A., through Alejandro Burzaco and others, at times relied on Sports Marketing Executive #1, Sports Marketing Executive #2, Sports Marketing Company A, and the Off-the-Books Companies to facilitate the payment of bribes and kickbacks to certain of the co-conspirator soccer officials in connection with the Copa Libertadores.  TORNEOS also relied on José Margulies and the Margulies Intermediaries, among other intermediaries, to facilitate the payment of bribes and kickbacks to CONMEBOL officials in connection with the Copa Libertadores.

          iii.     CONMEBOL Copa América and CONMEBOL/CONCACAF
                Copa América Centenario Rights

39.     In or about May 2013, Productora de Eventos S.A., a subsidiary of the defendant TORNEOS Y COMPETENCIAS S.A., Traffic, and Sports Marketing Company A formed Datisa, a new company in which each entity held a one-third interest.  Datisa subsequently entered into a $317.5 million contract with CONMEBOL to obtain the exclusive worldwide rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario.

40.     Following negotiations between CONMEBOL and CONCACAF, it was determined that the men's national teams of six CONCACAF member associations, including the U.S. national team, would participate in the Copa América Centenario with the 10

15

CONMEBOL men's national teams. It was further determined that the tournament would be hosted by the United States in recognition of the growth of the market for soccer in North America. Datisa subsequently entered into a $35 million contract with CONCACAF, in its capacity as the co-organizer of the Copa América Centenario, to acquire CONCACAF's media rights to the tournament.

41.    In connection with the acquisition of the media rights to the Copa América and the Copa América Centenario, the defendant TORNEOS Y COMPETENCIAS S.A., through Alejandro Burzaco, and TORNEOS's partners in Datisa agreed to pay and caused to be paid tens of millions of dollars in bribes to various soccer officials, including Luis Bedoya, Rafael Esquivel, Sergio Jadue, Jeffrey Webb, Soccer Official #1, Soccer Official #2, Soccer Official #3, Soccer Official #4, Soccer Official #5, Soccer Official #7, Soccer Official #8, Soccer Official #9, Soccer Official #10, Soccer Official #11, Soccer Official #12, and Soccer Official #13. The Datisa partners agreed to make these payments at various times over the life of the contracts.

42.    The defendant TORNEOS Y COMPETENCIAS S.A.'s subsidiary Productora de Eventos S.A. and its Datisa partners relied on the Off-the-Books Companies, José Margulies, and the Margulies Intermediaries, among others, to facilitate the payment of bribes and kickbacks to CONMEBOL officials from and through accounts controlled by the Datisa shareholders in connection with the Copa América and Copa América Centenario tournaments.

* * * *

43.    The defendant TORNEOS Y COMPETENCIAS S.A. and its co-conspirators used the wire facilities of the United States to facilitate and effect certain payments in furtherance of the criminal scheme, including in connection with each of the tournaments

16

referenced in paragraphs 34 through 42 above, and to communicate with co-conspirators and others in furtherance of the criminal scheme. Such use of United States wire facilities included, among other things, the use of the bank accounts of TORNEOS's subsidiaries and affiliates held at United States financial institutions to transfer tens of millions of dollars in payments related to contracts secured through bribery, as well as the use of the bank accounts of co-conspirators, including the Margulies Intermediaries, held at United States financial institutions to transfer millions of dollars in bribe payments. TORNEOS and its co-conspirators also relied, in part, on the growing market for soccer in the United States to generate profits from the scheme, and conducted meetings in furtherance of the scheme in the United States.

44.      The defendant TORNEOS Y COMPETENCIAS S.A. and its co-conspirators engaged in conduct designed to prevent the detection of their illegal activities, to conceal the location and ownership of proceeds of those activities, and to promote the carrying on of those activities. The conduct engaged in by various members of the conspiracy included, among other things: the use of "consulting services" agreements, sham invoices and payment instructions, and other similar types of records to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries (including the Margulies Intermediaries), bankers (including Banker #1 and Banker #2), and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies; and the use of cash.

45.      No disclosure of any of the foregoing bribery and kickback schemes was made to FIFA, CONMEBOL, or CONCACAF, including without limitation to their respective executive committees, congresses, or constituent organizations.

17

## WIRE FRAUD CONSPIRACY

46.     The allegations contained in paragraphs one through 45 are realleged and incorporated as if fully set forth in this paragraph.

47.     In or about and between January 2000 and May 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant TORNEOS Y COMPETENCIAS S.A., together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA, CONMEBOL, and CONCACAF and their constituent organizations, including to deprive FIFA, CONMEBOL, and CONCACAF and their constituent organizations of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit: wire transfers, emails, facsimiles, and telephone calls, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

48.     The United States hereby gives notice to the defendant that, upon its conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any and all property, real

18

or personal, which constitutes or is derived from proceeds traceable to a violation of such offense.

49.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

>   (a)     cannot be located upon the exercise of due diligence;
>
>   (b)     has been transferred or sold to, or deposited with, a third party;
>
>   (c)     has been placed beyond the jurisdiction of the court;
>
>   (d)     has been substantially diminished in value; or
>
>   (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

19